**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| GOM SHELF, LLC, | } |
| | } |
| *Plaintiff*, | } |
| v. | } Civil Case No. 4:06-cv-3444 |
| | } |
| SUN OPERATING LIMITED | } |
| PARTNERSHIP, *et al*, | } |
| | } |
| *Defendants*. | } |

## <u>MEMORANDUM OPINION AND ORDER</u>

Presently before the Court in this breach of contract case are Plaintiff's Motion for Partial Summary Judgment (Doc. 17); Defendant Kerr-McGee Oil & Gas Onshore LP's Response to Plaintiff's Motion for Partial Summary Judgment (Doc. 26); Defendant Online Resources, Inc.'s Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 28); Plaintiff's Reply to Defendants' Responses to Plaintiff's Motion for Partial Summary Judgment (Doc. 30); Defendants' Amended Joint Motion for Summary Judgment (Doc. 25); Response to Defendants' Amended Motion for Summary Judgment (Doc. 27); and Defendant Kerr-McGee Oil & Gas Onshore LP's Reply to Plaintiff's Response to Defendants' Amended Joint Motion for Summary Judgment (Doc. 29).  For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment (Doc. 17) is GRANTED, and Defendants' Amended Joint Motion for Summary Judgment (Doc. 25) is DENIED.

I.          Relevant Factual Background

      A.          The Lease

On April 1, 1975, the United States Department of the Interior ("DOI") entered into an Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act ("the lease") of Block A-16, Mustang Island, Offshore Texas ("Block A-16") with Cities Service Oil Company, Skelly Oil Company, Sun Oil Company, and Getty Oil Company.  (Doc. 17 Ex. 1).  Each company obtained an undivided twenty-five percent (25%) interest in Block A-16. (*Id.*).  Section 1 of the lease, entitled "Statutes and Regulations," states:

> This lease is made pursuant to the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462, 43 U.S.C. Secs. 1331, *et seq.*) (hereinafter called the Act).  This lease is subject to all the provisions of the Act and to all the terms, conditions and requirements of the valid regulations promulgated by the Secretary of the Interior (hereinafter called the Secretary) thereunder in existence upon the effective date of this lease, all of which are incorporated herein and, by reference, made a part hereof.  This lease shall also be subject to regulations hereafter issued by the Secretary pursuant to his authority under section 5(a)(1) of the Act to prescribe and amend at any time such rules and regulations as he may determine to be necessary and proper in order to provide for the prevention of waste and for the conservation of the natural resources of the Outer Continental Shelf, and for the protection of correlative rights therein, which regulations shall be deemed incorporated herein and, by reference, made a part hereof when promulgated.

(*Id.*).  Since the lease's execution in 1975, there have been several changes in ownership.  (Doc. 17 Ex. 2).  Section 3(j) of the lease outlines the procedure for assigning a leasehold interest.  It states, "Assignment of lease. To file for approval with the appropriate office of the Bureau of Land Management any instrument of transfer of this lease, or any interest therein, required to be filed under applicable regulations, within the time and in the manner prescribed by the applicable regulations."  (Doc. 17 Ex. 1).  The Court will address each of the relevant lease assignments involving Block A-16, in turn.

B.      A Summary of the Assignments[1]

        1.      Assignment Effective October 1, 1988 ("Assignment 1")

Texaco Producing, Inc. ("TPI") conveyed an undivided fifty percent (50%) interest in Block A-16 to OXY USA, Inc. ("Oxy") and an undivided fifty percent (50%) interest to Sun Operating Limited Partnership ("Sun").  (Doc. 17 Ex. 2).  The Assignment of Title Interest was executed on December 15, 1988, and included the following provisions, which are both relevant to the issues in controversy in this case:

> All the terms and provisions of this conveyance are hereby expressly made subject to all Federal laws and to all orders, rules, regulations and standards issued thereunder by all duly constituted political subdivisions and agencies having jurisdiction, and Oxy and Sun hereby warrant that they will comply with same.  Further, Oxy and Sun specifically warrant that they will comply with all laws, orders, rules, regulations and standards of all Federal agencies applicable to (1) all exploration, drilling, production, plugging, and abandonment procedures, and (2) the control, regulation and prevention of pollution including, but not limited to, salt water discharge and contamination.

> Oxy and Sun expressly agree to assume TPI's pro rata share of the obligation to plug and abandon the Wells and Equipment herein conveyed at their sole cost, risk and expense and in full compliance with any and all applicable Federal laws, orders, rules, regulations and standards.

(*Id.*).  The DOI's Minerals Management Service ("MMS") approved this assignment on March 13, 1990.  (*Id.*).  As a result of this assignment, Oxy obtained an undivided fifty percent (50%) interest in Block A-16, as did Sun.

        2.      Assignment Effective September 1, 1995 ("Assignment 2")

Sun conveyed its undivided fifty percent (50%) interest in Block A-16 to Trade & Development Corporation ("TDC").  (Doc. 25 Ex. B).  The Assignment and Bill of Sale was

---

[1] With respect to the assignments described in Sections I(B)(3)-(6), the assignment approval letters issued by the MMS for these assignments each contained a provision identical to the one quoted in Section I(B)(2).

executed on February 29, 1996, and the MMS approved the assignment on August 19, 1996.

(*Id.*).  In its assignment approval letter, the MMS states, in pertinent part:

> The approval of this assignment is restricted to record title interest only,
> and by virtue of this approval, the Assignee is subject to, and shall fully
> comply with, all applicable regulations now or to be issued under the
> Outer Continental Shelf Lands Act, as amended.   Notwithstanding any
> agreement between the Assignor and Assignee, the parties remain subject
> to the liability provisions of the Minerals Management Service regulations
> codified at 30 CFR 256.62 (d) and (e).

(*Id.*).  As a result of this assignment, TDC obtained an undivided fifty percent (50%) interest in

Block A-16.

### 3.      Assignment Effective September 1, 1995 ("Assignment 3")

TDC assigned twelve-and-a-half percent (12.5%) of its interest in Block A-16 to

Online Resources, Inc. ("Online").   (Doc. 25 Ex. C).   The Assignment and Bill of Sale was

executed on June 10, 1996, and the MMS approved the assignment on August 19, 1996.  (*Id.*).

As a result of this assignment, Online obtained an undivided twelve-and-a-half percent (12.5%)

interest, and TDC kept a thirty-seven-and-a-half percent (37.5%) interest in Block A-16.

### 4.      Assignment Effective October 1, 1998 ("Assignment 4")

TDC conveyed its remaining thirty-seven-and-a-half percent (37.5%) undivided

interest in Block A-16 to Cronus Offshore, Inc. ("Cronus").   (Doc. 25 Ex. D).   The Assignment

and Bill of Sale was executed on October 30, 1998, and the MMS approved the assignment on

May 25, 1999.  (*Id.*).   As a result of this assignment, Cronus obtained an undivided thirty-seven-

and-a-half percent (37.5%) interest in Block A-16.

### 5.      Assignment Effective October 1, 1998 ("Assignment 5")

Online assigned its remaining twelve-and-a-half percent (12.5%) undivided

interest in Block A-16 to Cronus.   (Doc. 25 Ex. E).   The Assignment and Bill of Sale was

executed on November 16, 1998, and the MMS approved the assignment on May 25, 1999. (*Id.*).  As a result of this assignment, Cronus became the holder of a fifty percent (50%) undivided interest in Block A-16.

> 6.  Assignment Effective July 8, 2000 ("Assignment 6")

Oxy assigned its fifty percent (50%) undivided interest in Block A-16 to GOM Shelf, LLC ("GOM").  (Doc. 17 Ex. 2).  The Assignment of Oil and Gas Lease was executed on July 8, 2000, and the MMS approved the assignment on October 25, 2000.  (*Id.*).  As a result of this assignment, GOM became the holder of a fifty percent (50%) undivided interest in Block A-16.

Accordingly, as of July 8, 2000, GOM held a fifty percent (50%) undivided interest in Block A-16, as did Cronus.  Several months later, on October 25, 2000, GOM and Cronus designated GOM as the operator of the subject lease for Block A-16.  (Doc. 17 Ex. 2).

> D.  The Joint Operating Agreement[2]

The Joint Operating Agreement ("the JOA") applicable to the lease for Block A-16 contains a provision entitled, "10. Surrender and Assignment of Leases."  (*Id.*).  With respect to obligations which have accrued prior to assignment, the first part of this provision states:

---

[2] Cities Service Oil Company, Sunray DX Oil Company, Skelly Oil Company, and Tidewater Oil Company executed the JOA on January 12, 1965.  The JOA contains a provision entitled, "2. Effective Period," which states as follows:

> This agreement shall remain in full force and effect for the full term of any lease or leases becoming subject hereto and any and all extensions and renewals of any such leases, whether extended by production or otherwise; and shall continue in full force thereafter until all materials, equipment, supplies, and property affected hereby and owned by the parties hereto have been salvaged and disposed of and until final settlement of accounts has been made by the parties hereto.  This agreement shall be terminable only by the unanimous consent of the parties hereto, provided that, if any party so desires, it may be relieved from all obligations and liabilities not previously incurred under this agreement by assigning to the other parties, in the same manner and as hereinafter stipulated for the assignment of interest in individual leases, all of its right, title and interest in and to the leasehold rights affected hereby, together with any personal property thereon.

(Doc. 17 Ex. 3).

> This agreement and the rights and interests of the parties hereunder shall be assignable by any party hereto as to its entire undivided interest in the leases, permits and areas then covered by this agreement, or as to a portion of said undivided interest with respect to all, but not a part only, of said leases, permits and areas, and the provisions of this agreement shall extend to and be binding upon the successors and assigns of the respective parties hereto.  The assignment of any such interest shall not relieve the assignor making such assignment of any responsibility or liability hereunder accruing on or prior to the execution, delivery and approval by lessor, if required, of such assignment unless consented to in writing by all of the parties then owning and holding interests in said leases, permits and areas. No assignment shall be permitted under the provisions of this article except the assignment of an equal undivided interest in the rights hereunder with respect to all of the leases, permits and areas then subject to this agreement.

(*Id.*).  With respect to obligations which have accrued after an assignment, this provision goes on to state:

> Should any party hereto sell its entire interest in the leases, permits and areas, then the party so disposing of its interest shall be relieved of all obligations hereunder which accrue subsequent to the date of the delivery to the purchaser of written assignment or conveyance of such interest, approved by lessor, if such approval is required, provided that the party disposing of its entire interest has fully paid its share of all costs incurred or accrued hereunder to the time of such sale.

(*Id.*).  The JOA also includes a provision entitled, "14. Laws and Regulations," which states:

> This agreement and the operations contemplated hereby shall be subject to all valid laws and all valid rules, regulations and orders of any regulatory body having jurisdiction, and in the event any provision of this agreement shall be found to be contrary to, or inconsistent with, any such law, rule, regulation, or order, the latter shall be deemed to control and this agreement shall be deemed modified accordingly, but in all other respects to continue in full force and effect.

> Nothing contained in this agreement shall be deemed to constitute the waiver by any party of any right it would otherwise have to contest the validity of any law or any order or regulation of governmental authority whether State or Federal, relating to, or affecting the conduct of, operations within the operating areas or to appeal from any such order.

(*Id.*).  Accordingly, the JOA is instructive on both the parties' liabilities and responsibilities as they relate to assignment and the law which shall apply.

      E.    Plugging and Abandoning Costs

Plaintiff GOM paid one hundred percent (100%) of the plugging and abandoning costs for Block A-16 from 2002 to 2006.  At the time these expenses accrued, GOM had a fifty percent (50%) undivided interest in Block A-16 and was its designated operator.  Cronus held the remaining fifty percent (50%) undivided interest in Block A-16.  Cronus, however, filed for Chapter 7 bankruptcy, and, as a result, GOM has been unable to collect Cronus' proportionate share of the plugging and abandoning costs.  Therefore, GOM has filed the instant suit against two assignors, Sun and Online, seeking reimbursement for these costs.

II.    Procedural Background

Plaintiff GOM originally filed this action against Defendants Sun and Online on August 31, 2006, in the 11th Judicial District Court of Harris County, Texas (Cause No. 2006-55450).  Plaintiff served Defendant Sun on October 2, 2006.  Shortly thereafter, on October 31, 2006, Defendant Sun filed a Notice of Removal of Action (Doc. 1) with this Court.

Presently before the Court are Plaintiff's motion for partial summary judgment and Defendants' motion for summary judgment.  Plaintiff asks the Court to find, as a matter of law, that (1) the operative documents are unambiguous; (2) the defendants have a continuing obligation to pay their share of plugging and abandoning costs; and (3) there is no valid release of defendants' obligation.  Defendants argue that (1) they were not parties to the JOA at the time Plaintiff incurred the costs for which it seeks recovery, and thus, cannot be liable for breach of contract, unjust enrichment, or equitable subrogation for failure to pay such costs; and (2) the

express terms of the JOA release them of payment obligations accruing subsequent to the date of any assignment of their interest in Block A-16 and the JOA.

III.        Legal Standard on Summary Judgment

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).  The substantive law governing the suit identifies the essential elements of the claims at issue and, therefore, indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor.  *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).   To do so, the nonmovant must "go beyond

the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994);  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).  Nor are pleadings summary judgment evidence.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at1075).  The non-movant cannot discharge his burden by offering vague allegations and legal conclusions.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party.  *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the

existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167,

178 (5th Cir. 1990).   In reviewing evidence favorable to the party opposing a motion for

summary judgment, a court should be more lenient in allowing evidence that is admissible,

though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club,

Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

IV.        Discussion

        The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333 *et seq.*

provides, in pertinent part:

> (1) The Constitution and laws and civil and political jurisdiction of the
> United States are extended to the subsoil and seabed of the outer
> Continental Shelf and to all artificial islands, and all installations and other
> devices permanently or temporarily attached to the seabed, which may be
> erected thereon for the purpose of exploring for, developing, or producing
> resources therefrom, or any such installation or other device (other than a
> ship or vessel) for the purpose of transporting such resources, to the same
> extent as if the outer Continental Shelf were an area of exclusive Federal
> jurisdiction located within a State…

> (2)(A) To the extent that they are applicable and not inconsistent with this
> subchapter or with other Federal laws and regulations of the Secretary
> now in effect or hereafter adopted, the civil and criminal laws of each
> adjacent State, now in effect or hereafter adopted, amended, or repealed
> are declared to be the law of the United States for that portion of the
> subsoil and seabed of the outer Continental Shelf, and artificial islands and
> fixed structures erected thereon, which would be within the area of the
> State if its boundaries were extended seaward to the outer margin of the
> outer Continental Shelf…

*Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990)

(quoting 43 U.S.C. § 1333(a)).   Therefore, federal law governs actions under OCSLA to the

extent that applicable federal law exists. *Bartholomew v. CNG Producing Co.*, 862 F.2d 555,

557 (5th Cir. 1989) (citing *Nations v. Morris*, 483 F.2d 577 (5th Cir. 1973)).

There are two parts in the Code of Federal Regulations that are relevant to the issues presented in this case.  First, 30 C.F.R. § 250.1702 states, in pertinent part, "You accrue decommissioning obligations when you…(d) [a]re or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged according to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction."  30 C.F.R. § 250.1702(d).  Second, the applicable subparts of 30 C.F.R. § 256.62 state:

> (d) You, as assignor, are liable for all obligations that accrue under your lease before the date that the Regional Director approves your request for assignment of the record title in the lease.  The Regional Director's approval of the assignment does not relieve you of accrued lease obligations that your assignee, or a subsequent assignee, fails to perform.

> (f) If your assignee, or a subsequent assignee, fails to perform any obligation under the lease or the regulations in this chapter, the Regional Director may require you to bring the lease into compliance to the extent that the obligation accrued before the Regional Director approved the assignment of your interest in the lease.

30 C.F.R. § 256.62.  The Fifth Circuit has held "that a violation of the MMS regulations does not give rise to a private cause of action.  The regulations govern the parties' joint and several liabilities vis-à-vis the Government, not amongst themselves."  *Fruge ex. rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 563 (5th Cir. 2003) (citations omitted).

Here, Plaintiff GOM seeks to have Defendants Sun and Online reimburse it for Cronus' proportionate share of the plugging and abandoning costs.  Although the Regional Director of the MMS may require the assignor to bring the lease into compliance under certain circumstances, a private individual or entity may not.  Because Cronus, the assignee, has failed to pay its share of the plugging and abandoning costs, the Regional Director may require the assignors, Sun and Online, to bring the lease into compliance to the extent that their obligations accrued before the Regional Director approved their respective assignments.  Sun and Online's

obligations accrued when they became lessees or owners of operating rights of the lease.  As this occurred before they assigned their interests in Block A-16, the Regional Director could require them to bring the lease into compliance.  The Regional Director, however, is not the plaintiff in this action.  Plaintiff GOM, rather, is a co-lessee and operator of Block A-16, in addition to being a private, non-governmental entity.

Although federal law may not provide a private cause of action, state law may.  If there is a gap in the federal law, "the law of the adjacent state is used as a gap-filler and becomes surrogate federal law."  *Id.*  For adjacent state law to apply as surrogate federal law under OCSLA, three conditions must be satisfied: (1) the controversy must arise on a situs covered by OCSLA; (2) federal maritime law must not apply of its own force; and (3) the state law must not be inconsistent with federal law.  *Union Texas Petroleum*, 895 F.2d at 1047.  Additionally, "OCSLA requires the application of state law as borrowed federal law to a non-maritime contract dispute arising out of the construction of a gathering line on the seabed of the Outer Continental shelf."  *Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.*, 448 F.3d 760, 774 (5th Cir. 2006) (citing *Union Texas Petroleum*, 895 F.2d at 1050).

Because there is no federal law providing for a private cause of action against the assignors, this Court must look to see if the law of the adjacent state, Texas, may be used as a gap-filler in this circumstance.  For adjacent state law to apply as surrogate federal law under OCSLA, the three *Union Texas Petroleum* conditions must be satisfied.  The Court will address each of these conditions, in turn.

First, the controversy arose on a situs covered by OCSLA.  In *Texaco Exploration and Production*, which involved an accident during the construction of an oil and gas production facility in the Gulf of Mexico, the Fifth Circuit explained that, "the complaint arises on an

OCSLA situs because the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development." *Texaco Exploration and Production*, 448 F.3d at 774. Accordingly, here, the Court finds that the complaint in the instant case arises on an OCSLA situs because Plaintiff's claims are "inextricably linked" to plugging and abandoning the well on Block A-16 in the Outer Continental Shelf. Furthermore, Plaintiff's claims would not have arisen but for the fact that this well existed.

Second, federal maritime law does not apply of its own force. "[I]n the context of oil and gas exploration on the Outer Continental Shelf, admiralty jurisdiction and maritime law will only apply if the case has a sufficient maritime nexus wholly apart from the situs of the relevant structure in navigable waters." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1230 (5th Cir. 1985). In *Laredo*, the Fifth Circuit held that "maritime law did not extend to cover a dispute arising out of the contract for an oil platform's construction." *Texaco Exploration and Production*, 448 F.3d at 774 (citing *Laredo Offshore Constructors*, 754 F.2d at 1229)). The *Laredo* court stated, "[n]or do we think that, under the circumstances existing here, the fact that the contract relates to offshore oil and gas exploration is itself a sufficient basis for the exercise of admiralty jurisdiction." *Laredo*, 754 F.2d at 1232. The lease, assignments, and JOA in the instant case relate to the plugging and abandoning of a well in the Outer Continental Shelf. This, however, is an insufficient basis for the exercise of admiralty jurisdiction and the application of maritime law. Just as in *Laredo* where maritime law did not extend to cover a dispute arising out of the contract for an oil platform's construction, it is here that maritime law should not extend to cover a dispute arising out of the lease, assignments, and JOA with respect to plugging and abandoning the well.

Third, Texas state law is not inconsistent with federal law.  Texas common law on the construction and operation of contracts shall apply to the facts of the instant case.  In *Union Texas Petroleum*, the "non-maritime contract disputes [arose] from the construction of a gathering line on the seabed of the outer Continental Shelf."  *Union Texas Petroleum*, 895 F.2d at 1045.  There, the Fifth Circuit found "[b]ecause the contracts at issue were nonmaritime, OCSLA came into force so that Louisiana state law applies to the claims for liens regardless of whether a particular service supplied would be maritime (e.g. charter hire)."  *Id.* at 1050.  OCSLA requires that the substantive law of the adjacent state apply.  *Id.*  This Court has found that OCSLA applies and the contracts at issue are non-maritime, therefore, Texas law governs the interpretation of the contracts.

The present case turns on whether the parties to the JOA expressly agreed on the consequences that should follow the assignment of an interest in Block A-16 to a third-party. The Court, therefore, will address language from Article 10, which states, in pertinent part:

> The assignment of any such interest shall not relieve the assignor making such assignment of any responsibility or liability hereunder accruing on or prior to the execution, delivery and approval by lessor, if required, of such assignment unless consented to in writing by all of the parties then owning and holding interests in said leases, permits and areas.
>
> Should any party hereto sell its entire interest in the leases, permits and areas, then the party so disposing of its interest shall be relieved of all obligations hereunder which accrue subsequent to the date of the delivery to the purchaser of written assignment or conveyance of such interest, approved by lessor, if such approval is required, provided that the party disposing of its entire interest has fully paid its share of all costs incurred or accrued hereunder to the time of such sale.

(Doc. 17 Ex. 3).

Under Texas law, in interpreting a contract, the court's primary concern "is to ascertain and to give effect to the intentions of the parties as expressed in the instrument."  *R & P*

*Enterprises v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980).  To achieve this objective, the court considers the contract as a whole.  *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("This court is bound to read all parts of a contract together to ascertain the agreement of the parties.  The contract must be considered as a whole . . . [and] each part of the contract should be given effect.").  When considered as a whole, a contract is ambiguous only if "it is reasonably susceptible to more than one meaning."  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  As Texas courts have recognized, "not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity."  *Forbau*, 876 S.W.2d at 134.  A court will not find a contract ambiguous if it may properly be given a certain legal meaning or interpretation. *See Nat. Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).

Plaintiff has asked the Court to find that the operative documents are unambiguous.  In their response, the defendants state, "Once this Court finds Article 10 to be unambiguous (as stipulated by the parties hereto), the Court must enforce Article 10 according to its terms."  (Doc. 26 at 12).[3]  "Neither the parties nor the lower courts have found this operating agreement ambiguous, and we likewise agree that it is not.  It's meaning is therefore a question of law."  *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (citing *Coker*, 650 S.W.2d at 394).  Accordingly, the Court finds that Article 10 of the JOA is not ambiguous, and, as such, its meaning is a question of law that the Court must resolve.

The first provision of Article 10 holds the assignors liable for liabilities and responsibilities that accrued before they assigned their interests to third parties.  If the Court applies 30 C.F.R. § 250.1702, which states that decommissioning obligations accrue when you "[a]re or become a lessee or the owner of operating rights of a lease on which there is a well that

---

[3] Article 10 of the JOA is the provision entitled "Surrender and Assignment of Leases."

has not been permanently plugged according to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction," 30 C.F.R. § 250.1702(d), then the defendants' plugging and abandoning liabilities and responsibilities accrued before they assigned their interests in Block A-16. Their assignment, therefore, would not relieve them of these liabilities and responsibilities.

Even if the Court should find that the defendants' liabilities and responsibilities accrued from 2002 to 2006, the time period in which GOM incurred expenses associated with plugging and abandoning the well, the Court finds that the second provision cited above is not a valid release of the defendants' liabilities and responsibilities. "Generally speaking, a party cannot escape its obligations under a contract merely by assigning the contract to a third party." *Seagull Energy E&P*, 207 S.W.2d 346-47 (citations omitted). "Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract." *Id.* at 347 (citations omitted). In *Seagull Energy E&P*, the operator sought the reimbursement of costs incurred after the assignor assigned its interests to the assignee. The Texas Supreme Court found that "[t]he operating agreement simply does not explain the consequences of an assignment of a working interest to a third party." *Id.* at 346. The operating agreement in *Seagull Energy E&P* included a provision entitled "Assignment of Interest." It states:

> Each Participating Party desiring to abandon a well pursuant to Section 14.2 shall assign effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interests in such well and the equipment therein and its ownership in the production from such well. Any party so assigning ***shall be relieved from any further liability*** with respect to said well.

*Id.* The language in this provision is analogous to the language used in Article 10 of the JOA in the present case, which states:

> Should any party hereto sell its entire interest in the leases, permits and areas, then the party so disposing of its interest ***shall be relieved of all obligations hereunder which accrue subsequent to the date of the delivery to the purchaser of written assignment or conveyance of such interest***, approved by lessor, if such approval is required, provided that the party disposing of its entire interest has fully paid its share of all costs incurred or accrued hereunder to the time of such sale.

(Doc. 17 Ex. 3).  The Texas Supreme Court in *Seagull Energy E&P* found that "the operating agreement did not expressly provide that Eland's obligations under the operating agreement should terminate upon assignment and Seagull did not expressly release Eland following the assignment of its working interest."  *Seagull Energy E&P*, 207 S.W.3d 347.  Accordingly, the Court reaches the same conclusion in this case.  The JOA did not expressly provide that Sun and Online's obligations under the operating agreement should terminate upon assignment, and these defendants were not expressly released following the assignments of their working interests.

When a court finds that there is no express release in an assignment, "the contract's subject or other circumstances may indicate that obligations were not intended to survive assignment."  *Id.*  The Court, however, does not find that the JOA's subject or any other circumstances imply that Sun or Online should be released of their obligations after they assigned their interests in Block A-16.

The Court, therefore, finds that Defendants Sun and Online have a continuing obligation to pay their share of plugging and abandoning expenses.

V.        Conclusion

Accordingly, the Court hereby ORDERS that Plaintiff's Motion for Partial Summary Judgment (Doc. 17) is GRANTED, and Defendants' Amended Joint Motion for Summary Judgment (Doc. 25) is DENIED.

SIGNED at Houston, Texas, this 31st day of March, 2008.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE